No. 37,050

LUCILE E. NEIMAN and HOWARD R. BRAINERD, *Appellants*, v. COURTNEY B. DAVIS and COURTNEY B. DAVIS, INC., *Appellees*.

(200 P. 2d 322)

Opinion filed December 11, 1948.

*Byron Brainerd*, of Wichita, argued the cause, and *Claude I. Depew, W. E. Stanley, Lawrence Weigand, William C. Hook, Lawrence E. Curfman* and *Wm. C. Kandt*, all of Wichita, were with him on the briefs for the appellants.

*P. K. Smith*, of Wichita, argued the cause, and *Ralph E. Gilchrist, Leroy*

*Warner* and *Carl L. Buck,* all of Wichita, and *Bernard Peterson,* of Newton, were with him on the briefs for the appellees.

The opinion of the court was delivered by

THIELE, J.: This is an appeal from a judgment of the district court modifying a survey of real estate made by the county surveyor of Harvey county and arises out of the following:

Under date of September 1, 1945, Lucile E. Neiman, hereafter called Neiman, filed her petition with the county surveyor to have a survey "to permanently establish the corners and boundaries" of the west half of the southwest quarter of section 19, township 24, range 2, east of the 6th P. M., in Harvey county. Under proceedings of which there is no complaint, proper notices were given and the survey was made. Courtney B. Davis individually and Courtney B. Davis, Inc., hereafter called Davis, gave notice of appeal to the district court. At the trial in the district court oral and documentary evidence was received. The trial court found (1) that the above southwest quarter had never been divided by the government survey; (2) that the county surveyor made the survey by following government rules for resurveying government lands and did not follow the statute of Kansas with reference thereto; and (3) that the survey should be modified by directing the county surveyor to divide the quarter section into two equal parts in which the east half and the west half should be allowed an equal number of acres; and on May 29, 1947, it rendered judgment accordingly. The record does not disclose what particular statute was referred to in finding (2) above. Neiman's motion for a new trial was denied on June 5, 1947, and in due time she perfected her appeal to this court from certain preliminary orders, from the judgment, and from the denial of her motion for a new trial. Her specification of errors covers the matters hereafter discussed.

Neiman first contends the district court erred in not sustaining her motion to dismiss Davis's appeal to that court for the reason it was not taken in time. Without setting forth the date the survey was completed and certified, the date it was marked filed, and the statement of the county surveyor to Davis, we think it must be held the appeal was in time. Other specifications will be discussed after a review of the evidence is made.

Although it might be of interest, limits of space do not permit any extended review of the history of surveys of the government

lands, nor of the statutes enacted by the congress of the United States pertaining thereto. It is interesting to note however that a committee of the Continental Congress, headed by Thomas Jefferson, in May, 1784, reported an ordinance for ascertaining the mode of locating and disposing of the lands in the western territory. Originally the size of a township and the order of numbering sections were different than now prevails. After the adoption of the constitution it was recognized that the public lands, especially in the northwest territory, could not be disposed of until they had been surveyed. An act of May 18, 1796, provided for the appointment of a surveyor general and for a survey. An act of February 11, 1805, directed subdivisions into quarter sections. An act of April 25, 1812, provided that there should be established in the department of the treasury an office to be called the General Land Office with designated duties respecting the public lands. An act of April 24, 1820, provided for the sale of public lands in half quarter sections under rules and regulations as might be prescribed by the secretary of the treasury. Intervening acts will not be noticed but an act of April 5, 1832, directed the subdivision of public lands into quarter-quarter sections and that in every case of the division of a half quarter section the line should run east and west and that fractional sections should be subdivided under rules and regulations prescribed by the secretary of the treasury. Under this provision the secretary directed that the residuary portion of a fractional section, after division into as many quarter-quarter sections as it is susceptible of, might be subdivided into as many lots, each containing the quantity of a quarter-quarter section, as nearly as might be practicable, by so laying down the line of subdivision that they should be twenty chains wide, which distances were to be marked on the plat of subdivision, as also the areas of the quarter-quarters and residuary fractions. By later enactments jurisdiction of the public lands and the survey thereof was placed with the secretary of the interior. We need not note in detail the reasons therefor, but the rule is and was that the public lands should be divided by north and south lines run according to the true meridian and by lines crossing at right angles. By reason of the convex surface of the earth, the system of rectangular surveys required the use of correction lines and rules for disposing of shortages or overages resulting. Without tracing its history, the statute embraced two provisions which were in effect when the survey presently involved was made. One was that where the ex-

terior lines of townships which may be subdivided into sections and half sections exceed or do not extend six miles, the excess or deficiency should be noted and added to or deducted from the western and northern ranges of sections or half sections, and that such sections or half sections should be sold as containing only the quantity expressed in the returns and plats respectively, and all others as containing the complete legal quantity. After making provision for marking lines and keeping notes, it was provided that the field books should be returned to the surveyor general who should cause a fair plat to be made of the townships and fractional parts of the townships, and copies sent to places of sale and to the general land office. It was further provided that in case of division of a quarter section, the corners and content of quarter-quarter sections should be ascertained as nearly as might be, on the principles directed and prescribed for sections and half sections. A fuller explanation may be found in "Manual of Surveying Instructions for the Survey of the Public Lands of the United States and Private Land Claims" prepared under the direction of the commissioner of the General Land Office, dated January 1, 1902, and printed by the Government Printing Office in 1908. The statutes as at present existing, and annotations as to their history, may be found in U. S. C. A. Title 43, §§ 751, 752 and 753. Other discussions may be found in "Manual of Instructions for the Survey of the Public Lands of the United States, 1947" prepared and published by the Bureau of Land Management and printed by the United States Government Printing Office, and in Clark on Surveying and Boundaries, Second edition.

We note G. S. 1868, chapter 100, and also Laws of Kansas 1876, chapter 131, wherein the state auditor was made ex officio register of the state land office and directed to keep permanent records "to show and preserve an accurate chain of title from the general government to the purchaser of each smallest subdivision of land" and that he shall receive any field notes, maps, etc., relating to the public survey of this state whenever the same shall be turned over to the state in pursuance of an act of congress of June 12, 1840. We note also that such documents were received by the auditor many years ago. As presently existing the above acts now appear as G. S. 1935, ch. 75, art. 28. Provision is also made for the county surveyor to procure official copies of the plats and field notes of the original surveys of the United States of the lands in his county (G. S. 1935, 19-1418).

We turn now to the evidence. Davis testified as to his purchase of the east half of the southwest quarter of section 19 and his sale thereof to Courtney B. Davis, Inc. He also testified at length about improvements on the property. He further stated that after he purchased the land he had it surveyed by Mavity, the county surveyor of Harvey county, and he offered in evidence a copy of the survey. He also testified to facts showing that no notices were served and in effect that it was a private as distinguished from a legal or permanent survey. Mavity did not testify and there was no explanation of the survey. Neiman's objections were overruled and a photographic copy of the survey was received. For present purposes it may be said the plat of the survey, which is the only thing shown in the record, discloses that the north line of the quarter section was 2,803.4 feet and the south line 2,788.1 feet and that the east and west halves each contained 84.67 acres. The remainder of Davis's testimony pertained solely to improvements on the land. Neiman demurred to the evidence on the ground it failed to show any error in the survey appealed from or to point out any irregularities in the survey. This demurrer was overruled and the ruling is assigned as error. We shall not discuss the sufficiency of Davis's proof for the reason that Neiman's proof and some evidence later received by agreement brought into the case all of the evidence bearing on the correctness of the survey.

Neiman's exhibit No. 1 was a certified copy of the U. S. survey notes on file in the office of register of the state land office. For present purposes we need be concerned only with the north and south lines of section 19. Omitting matters presently immaterial those notes show, as to the north line, that a common corner was fixed for sections 17, 18, 19 and 20, and from there west on a random line between sections 18 and 19, 40:00 set a post for temporary quarter section corner, 81.68 intersected west boundary south of corner to sections 18 and 19, then east on a true line between sections 18 and 19, 41.68 set a stone 81.68 the corner to sections 17, 18, 19 and 20. As to the south line, that a common corner was fixed to sections 19, 20, 29 and 30, and from there west on a random line between sections 19 and 30, 40:00 set a post for temporary section corner 81.82 intersected west boundary south of corner to sections 19 and 13, then east on a true line between sections 19 and 30, 41.82 set a stone 81.82 the corner to sections 19, 20, 29 and 30. There is no specific showing that the distance figures given are

chains but there is no contention they are otherwise. Without further explanation these notes show that stones were set at each corner of the section and at each intervening quarter section corner.

Neiman's exhibit No. 4 is a photostatic copy of a portion of the U. S. government plat of township 24, south of range 2, east of the 6th P. M., and is certified by the surveyor general under date of August 4, 1860, to be strictly conformable to the field notes of the survey thereof, which have been examined and approved. This plat shows that section 19 contains 654 acres. The north line of the west half of the northwest quarter shows a measurement of 21.68 chains. The west half of the northwest quarter section is divided into a north half containing 43.40 acres and a south half containing 43.46 acres. The south line of the west half of the southwest quarter section shows a measurement of 21.82 chains. The west half of the southwest quarter is divided into a north half containing 43.54 acres and a south half containing 43.60 acres. The total of these tracts comprising the west half of the west half of the section is 174 acres. No figures being noted, the east half of the west half of the section must be assumed to have 160 acres and the east half of the section to have 320 acres. Addition of all figures shows that the total content of the section is 654 acres.

The survey notes of Craig, the county surveyor who made the survey in issue, show that he found the following government corners, the northwest corner, the north quarter corner, the east quarter corner, the south quarter corner and the southwest corner of section 19 and that he reëstablished the west quarter corner. Without setting forth details he found by chaining that more land was included in the section than was called for in the government field notes and plats; that there was no government call for length of the north line of the southwest quarter and he established it by taking the mean between the calls for the north and south lines of the section; that the north line of the east half of the quarter section would be 20 chains and the north line of the west half would be 21.75 chains; that the south line of the east half of the quarter section would be 20 chains and the south line of the west half would be 21.82 chains; and that prorating the excess lands over the government calls between the east and west halves of the quarter section, the north corner between them would be 1,459.7 feet east of the northwest corner of the quarter section and 1,342.2 feet west of the northeast corner thereof, and that the south corner between the

two halves would be 1,456.9 feet east of the southwest corner of the quarter section and 1,335.4 feet west of the southeast corner thereof. He stated that he set iron bars marking the north and south corners between the east and west halves of the quarter section at the places above noted. Mr. Craig's oral testimony went into detail as to methods followed by him and whether he took into consideration certain deeds hereafter mentioned, and he stated he had examined the deed records.

We note the following: In the survey made by Mavity, the length of the north line of the southwest quarter of section 19 was 2,803.4 feet and the south line was 2,788.91 and that he divided the east and west halves in such manner that the north line of each half was 1,401.7 feet long and the south line of each half was 1,394.05 feet long. Craig found the north line of the quarter section to be 2,801.9 feet long and the south line to be 2,792.3 feet long. Under his proration he found the north line of the east half to be 1,342.2 feet long and the south line to be 1,335.4 feet long, and the north line of the west half to be 1,459.7 feet long and the south line to be 1,456.9 feet long. It thus appears the division line between the two halves as fixed by Mavity was about 58 feet west of the line as fixed by Craig.

Other evidence as to records in the office of the register of deeds need not be set forth for the parties stipulated that abstracts of title could be received in evidence and we have since been furnished with copies of certain conveyances. The above documents disclose the following:

Under an act of congress of March 3, 1836, provision was made for a grant of lands in Kansas in alternate sections to aid in the construction of railroads. By act of the state legislature this grant was accepted by the state. (See G. S. 1868, ch. 84.) Thereafter, under date of March 31, 1873, the commissioner of the General Land Office, with the approval of the secretary of the interior, certified that certain lands, including the above section 19, were within the grant.

Under date of May 19, 1873, the state of Kansas issued its patent to the Atchison, Topeka and Santa Fe Railroad Company for various tracts of land, including all of section 19, township 24, range 2 east, containing 654 acres, the patent being recorded in book A, page 128, in the records of the state auditor's office, and later filed for record in the register of deeds' office in Harvey county on December 29, 1879, and recorded in volume I, page 402.

Thereafter, under date of September 28, 1883, the above-named railroad company conveyed by warranty deed to Anthony Haines, predecessor in title to Davis, five tracts of land described as the north half of the southeast quarter of section 27, township 22, south of range 1 east, and the east half of the northwest quarter of section 5 and the north half of the northeast quarter of section 31, township 22, south of range 2 east, also the north half of the northwest quarter of section 11 and the east half of the southwest quarter of section 19, township 24, south, range 2 east of the 6th principal meridian, "containing in all four hundred and 16/100 (400 16/100) acres, more or less according to the United States Survey." This deed was filed for record in the office of the register of deeds of Harvey county on November 29, 1883.

We pause here to note there was no testimony offered as to the quantity of land included in the separate tracts as conveyed by the above deed.

At the later date of July 3, 1885, the above-named railroad company conveyed by warranty deed to Morgan H. Whitcroft, predecessor in title to Neiman, the west half of the southwest quarter of section 19, township 24, south, range 2, east of the 6th P. M., "containing in all Eighty Seven [14] ($87^{14}$) acres more or less according to the United States Survey." This deed was filed for record in the office of the register of deeds of Harvey county on Septembre 28, 1885.

Although Neiman and Davis disagree as to the rules to be applied in making the survey, there is no disagreement as to the facts above stated. It is to be borne in mind that this is a proceeding to determine correctness of the survey made by Craig under statutory provision therefor, and that the determination of the line between the east half and the west half of the particular quarter section by the county surveyor does not put in issue the title to the real estate (*Swarz v. Ramala,* 63 Kan. 633, 66 Pac. 649). We therefore are not directly concerned with cases where title was the issue. Both parties quote from *Hoyne v. Schneider,* 138 Kan. 545, 27 P. 2d 558, which was an action to determine title. In that case there may be found a discussion of the United States survey and of the method of subdividing a quarter section of land bordering on an exterior line of a township, the statutes applicable, and the use of the word "half" in describing land. Reference is made to that opinion and there will be no repetition of what is there

said. In that case it was held that under a will giving one devisee the west half of the southwest quarter of a certain section 18, and another devisee the east half thereof, the testator intended they take the lands according to the U. S. government survey and not in equal quantitative parts.

It has been noted that the trial court found the involved southwest quarter had never been divided by the government survey, and Davis so contends here, arguing that the field notes do not show any measurements of division, nor placing of any monuments at the quarter-quarter corners, and that the government plat is but a report of what was done in the field and, in effect, can be no more. Under the statutes above referred to and those set out at length in *Hoyne v. Schneider*, supra, that contention cannot be sustained. It is common knowledge that section 19 is on the west side of the township. There is no room to argue but that shortages or overages of land within that section are to be reflected in the west quarters thereof, or if they are further divided in the west quarter-quarter sections. It is also clear that the division does not have to be made in the field. The field notes supplied ample information for the preparation of the plat, which shows on its face that it was examined and approved by the surveyor general. The plat shows the width of the west half of the southwest quarter and the acreage of the two quarter-quarters comprising it. The length of the west quarter section line is specified in the field notes, although not set forth earlier herein as there was no dispute concerning it. All of these matters disclose that the quarter section was divided as required by the statutes. The matter of interpretation of this survey by the patentee is considered later herein.

It has also been noted that the trial court found that the county surveyor made the survey by following government rules for resurveying government lands and did not follow the statute of Kansas with reference thereto. As has been noted, the record of the trial does not disclose the statute of Kansas referred to, nor does Davis in his brief make any argument that some particular statute controls. A review of all of our statutes pertaining to surveys to show a negative conclusion would unduly extend this opinion. We do note that G. S. 1935, 19-1409, refers only to subdividing sections into quarter sections; that 19-1411 refers to the establishment of center corners and quarter section corners of sections closing on a base line and makes no provision contrary to what the surveyor did

in the instant survey; that 19-1415 makes the plat and field notes evidence and that 19-1419 provides for taking evidence to prove any point material to the survey. Davis directs our attention to *Roadenbaugh v. Egy*, 88 Kan. 341, 128 Pac. 381, which was an appeal from a survey and where a review of some of our decisions may be found and reference is made thereto. Without fully reviewing that opinion, it may be said it was contended that the true boundary line was not necessarily the boundary line between two quarter sections but a line agreed upon by the original homesteaders. After stating it did not appear the surveyor erred in determining the true line between the two quarters, certain cases were cited to the effect that adverse possession may change the title to real estate, but it cannot change the location of a quarter section line. The conclusion of the court is reflected by the syllabus, which reads:

"In a survey, called for the specific purpose of establishing the boundary line between the northwest quarter and the northeast quarter of a certain section, it is the duty of the county surveyor, and of the court on appeal, to relocate the line according to the statutory rules for reproducing United States government surveys.

"If the survey be called to determine and permanently establish the corners and boundaries of one or more tracts of land severally owned or occupied, then it is the duty of the county surveyor, and of the court on appeal, to observe the statutory rules so far as applicable, and also to consider any other competent evidence which may be produced." (Syl. ¶¶ 1, 2.)

What does the other evidence reveal? The entire section was patented to the Atchison, Topeka and Santa Fe Railroad Company, the patent disclosing clearly that the section contained 654 acres. On September 28, 1883, the company conveyed by warranty deed to Haines, predecessor in title of Davis, five separate tracts including the Davis land, containing in all 400.16 acres more or less "according to the United States Survey." No showing is made that each tract did not contain the statutory quantity of eighty acres, and we assume that it did so. The excess of 16/100 acres, even if added to the Davis land, would not materially alter its boundaries. However, later and on July 3, 1885, the railroad company conveyed by warranty deed to Whitcroft, predecessor in title to Neiman, the west half of the southwest quarter of the particular section, "containing in all Eighty Seven [14] (87 [14]) acres more or less according to the United States Survey." According to the government plat, and as detailed above, the quarter-quarter sections embraced in the above west half contained respectively 43.54 and 43.60 acres, or the

total of 87.14 acres. It thus appears that the railroad company, the last common owner of the entire southwest quarter, conveyed the east and west halves as containing the actual acreage as shown on the government plat. No subsequent conveyance could or did change the division so made, and that it was conformable to the survey and plat may not be denied.

It may be said that other decisions are cited in the briefs and have been examined. None of them compel a result different than we reach herein.

The undisputed evidence shows that the southwest quarter of section 19, township 24, range 2, east of the 6th P. M., in Harvey county, Kansas, was divided by the government survey so as to comprise two quarter-quarter sections and one one-half quarter section, and that the county surveyor properly followed statutory requirements in determining the boundary line between the east half and the west half of such quarter section.

The judgment of the district court is reversed and the cause remanded with instructions to sustain the survey from which appeal was taken to the district court.

PRICE, J., not participating.